O
JS-6

# United States District Court
# Central District of California

| | |
|---|---|
| T.S., <br><br> Plaintiff, <br><br> v. <br><br> LONG BEACH UNIFIED SCHOOL DISTRICT, <br><br> Defendant. | Case № 2:21-cv-06274-ODW (DFMx) <br><br> **ORDER ON ADMINISTRATIVE APPEAL** |

## I.  INTRODUCTION

Plaintiff T.S. appeals from the decision of the California Office of Administrative Hearings ("OAH") Administrative Law Judge ("ALJ"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. The ALJ held that Defendant Long Beach Unified School District ("District") prevailed in full on six of T.S.'s seven issues, and both the District and T.S. prevailed in part on one issue. (Compl. Ex. 1 ("OAH Decision"), ECF Nos. 1, 1-1.) T.S. seeks reversal on three issues. (Compl.; Opening Br. 5–15, ECF No. 29). On December 5, 2022, the Court heard oral argument from the parties. For the reasons below, the Court **AFFIRMS** the OAH Decision and finds the District is the prevailing party on all issues that T.S. appeals.

## II. BACKGROUND

At the time of the OAH administrative hearing, T.S. was thirteen years old and a seventh-grade student. (*See* Notice of Manual Filing of Administrative Record ("AR") 400 (S-25), ECF No. 22.[1]) T.S. qualifies for special education under the IDEA in the primary category of autism. (AR 317 (S-22).)

On August 6, 2019, prior to the dispute at issue in this appeal, T.S. and the District executed a settlement agreement that resolved all then-existing claims between them concerning T.S.'s educational program, with a few exceptions. (AR 471–74 (D-2).) The settlement agreement provided for the District to fund several independent educational evaluations ("IEE"). (AR 472 (D-2).) Although T.S. requested, and the District offered, an occupational therapy ("OT") IEE as part of the mediation negotiations, the parties could not agree on an assessor, so OT was ultimately excluded from the settlement agreement. (*Id.*)

T.S.'s annual individualized education program ("IEP") meeting following the settlement agreement was due to be held in September 2019. (AR 476 (D-3).) However, because several IEEs remained outstanding, T.S.'s parents and the District agreed to postpone the meeting until the IEEs could be completed and reviewed. (AR 486 (D-3).) The IEP team meeting thus commenced on February 18, 2020. (AR 497 (D-11); *see also* AR 317 (S-22).) The annual IEP meeting ultimately spanned five two-hour sessions, for ten hours total, on February 18, February 28, May 20, October 16, and November 12, 2020. (AR 418 (S-25).)

### A. OAH Case No. 2020090441

On September 15, 2020, T.S. filed a complaint with the OAH for an administrative hearing. (AR 1–26 ("OAH Compl.").) As a result of the 2019 settlement agreement, the relevant time period for T.S.'s dispute in the case was August 6, 2019, to September 15, 2020. (*See id.*; AR 474; OAH Decision 1.) The

---

[1] Citations to the AR include the AR page number at each page's top right (i.e., "AR 400") and the exhibit identifier from the OAH due process hearing (i.e., "S-25" for Student exhibit 25 or "D-2" for District exhibit 2).

October and November 2020 IEP team meetings were thus not at issue during the administrative hearing, and they are not at issue in this appeal. (*See* OAH Decision 1, 6.[2])

T.S. raised seven issues via his September 15, 2020 OAH complaint:

1. Did the District timely conclude T.S.'s IEP that commenced on February 18, 2020?
2. Did the District fail to assess T.S. in the area of OT, including sensory integration, from September 2019 through September 2020, such that T.S. is entitled to an IEE at public expense?
3. Did the District deny T.S. a FAPE from March 2020 through September 2020, by not providing T.S. with educational services that T.S. could meaningfully access?
4. Did the District deny T.S. a FAPE from March 2020 through September 2020, by failing to provide T.S. with a computer with which he could meaningfully access online instruction?
5. Did the District deny T.S. a FAPE from February 2020 through September 2020, by failing to provide T.S. with the vision therapy services recommended by Dr. Ikeda?
6. Did the District deny T.S. a FAPE from September 2019 through September 2020, by failing to provide T.S. with assistive technology and accommodations described in his IEP?
7. Did the District deny T.S. a FAPE from September 2019 through September 2020, by denying him the opportunity for mainstreaming with non-disabled peers?

(OAH Decision 2–3; *see also* OAH Compl.)

ALJ Linda Johnson heard the matter via videoconference on March 9, 10, 11, 17 and 18, 2021, and issued a decision on May 6, 2021. (OAH Decision 1.) She held that the District prevailed fully on issues 1, 2, 4, 5, 6, and 7, and that the District and T.S. each partially prevailed on issue 3. (*Id.* at 20–21.)

---

[2] The OAH Decision, exhibit 1 to the Complaint in this action, may also be found at AR 660–84.

**B. This Appeal**

T.S. appeals ALJ Johnson's OAH Decision to this Court and challenges her holdings on issues 1, 2, and 5. (*See* Opening Br.) T.S. lodged the complete AR and the parties have fully briefed their positions based on that record. (*See id.*; AR; Opp'n, ECF No. 30; Reply, ECF No. 31.)[3]

### III. LEGAL STANDARD

The IDEA provides that "[a]ny party aggrieved by the findings and decision" reached through the state administrative hearing process "shall have the right to bring a civil action with respect to the complaint . . . in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A). In reviewing an administrative decision under the IDEA, district courts review the administrative proceeding records, hear additional evidence if the parties request it, and "grant such relief as the court determines is appropriate," based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). This modified *de novo* standard requires the Court to give the administrative proceedings "due weight" and not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). After such consideration, the district court "is free to accept or reject the findings in part or in whole." *Id.*; *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 n.1 (9th Cir. 2017) (noting that courts must "actually examine the record to determine whether it supports the ALJ's opinion").

The appeal of an IDEA administrative decision is properly styled and presented by the parties in a summary judgment format. *See Wartenberg*, 59 F.3d at 892. A court may make a final judgment based on the preponderance of evidence, in what is

---

[3] As T.S. raises only OAH issues 1, 2, and 5 in his Opening Brief, he has waived all other issues in this appeal. *See United States v. Bird*, 359 F.3d 1185, 1189 n.1 (9th Cir. 2004) (declining to consider issue on appeal which was not raised as issue in appellant's opening brief); *All Pac. Trading, Inc. v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1434 (9th Cir. 1993) ("Failure to raise the issue in the opening brief waived that issue on appeal.").

essentially a bench trial on a stipulated record. *Id.*; *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993). The petitioning party bears the burden of proof at the administrative hearing, *Schaffer v. Weast*, 546 U.S. 49, 62 (2005), and the party challenging the administrative decision bears the burden in the district court, *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009).

## IV. DISCUSSION

Preliminarily, the parties dispute the level of deference the Court should afford the ALJ's OAH Decision. (Opening Br. 5; Opp'n 11.) Substantively, T.S. argues that the Court should reverse the OAH Decision on three issues. (*See* Opening Br. 5–15.) First, T.S. argues that the District did not timely conclude the IEP that began on February 18, 2020 ("OAH Issue One"). (*Id.* at 5–8.) Second, T.S. contends that the District was obligated and failed to assess T.S. in the area of OT/sensory integration ("OAH Issue Two"). (*Id.* at 8–13.) Third, T.S. argues that IEE assessor Dr. Ikeda recommended further vision assessment and therapy, which the District should have funded ("OAH Issue Five"). (*Id.* at 13–15.) The District contends the OAH Decision was correct in all respects. (Opp'n 6, 13–19, 22–23.)

### A. Deference Due

A court must give "due weight" to administrative judgments regarding educational policy. *Ojai*, 4 F.3d at 1472. The Ninth Circuit instructs that more weight should be given if the findings are "thorough and careful" or pertain to witnesses' credibility, but exactly how much weight is due is a matter of the court's discretion. *Id.*; *Wartenberg*, 59 F.3d at 891; *Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001). Specifically, an ALJ's decision is entitled to "substantial weight" when it "evinces [the ALJ's] careful, impartial consideration of all the evidence and demonstrates [their] sensitivity to the complexity of the issues presented." *Ojai*, 4 F.3d at 1476.

T.S. contends that ALJ Johnson was "neither thorough nor careful," and therefore is not entitled to deference. (Opening Br. 5.) The District contends ALJ

Johnson's OAH Decision was thorough, careful, and well supported by the AR, and is therefore entitled to deference. (Opp'n 6.)

ALJ Johnson held the administrative hearing over five days, (OAH Decision 1), received testimony from nine witnesses, (*see* AR 275 (OAH Witness List); AR 953, 1140, 1321, 1575, 1646 (daily witness indices)), considered hundreds of pages of argument and evidence, (*see* AR 205–57, 274–659), and actively engaged with witness questioning, (*see generally* AR 750–1645 (hearing transcripts)). She issued a twenty-three-page decision in which she examined the evidence and arguments, rendered reasoned credibility determinations, reviewed the relevant legal standards, and found in part for each party on carefully articulated issues. (*See generally* OAH Decision.) The Court find's ALJ Johnson's OAH Decision thorough, careful, and supported by the AR. *See R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) ("[A] hearing officer's findings [are] thorough and careful when the officer participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions." (internal quotation marks and alterations omitted)). Accordingly, ALJ Johnson's determinations are entitled to deference.

### B. February 2020 IEP (OAH Issue One)

ALJ Johnson articulated this issue as: "Did Long Beach timely conclude Student's IEP that commenced on February 18, 2020?" (OAH Decision 2.) She held that T.S. "did not prove [the District] failed to timely conclude the IEP process" and "did not provide any evidence demonstrating that the delay in completing the IEP denied him a FAPE." (*Id.* at 7.)

A free appropriate public education, or "FAPE," means special education and related services that are available to an eligible child that meet state educational standards at no charge to the parent or guardian. 20 U.S.C. § 1401(9); 34 C.F.R. § 300.17. In general, a child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide

educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 201–04 (1982); *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 137 S. Ct. 988, 1000–01 (2017). An IEP must be in effect for an eligible child at the beginning of each school year. 34 C.F.R. § 300.323(a); Cal. Educ. Code § 56344(c).

An IEP meeting must be held at least annually, Cal. Educ. Code § 56343(d), to ensure that the IEP team revises the IEP to address "any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate," 20 U.S.C. § 1414(d)(4)(A). The parents of a child with a disability must be afforded an opportunity to participate in IEP meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a FAPE to the child. 34 C.F.R. § 300.501(b).

The failure to complete an IEP before the annual deadline does not necessarily result in a denial of a FAPE. Such a procedural violation results in a denial of a FAPE only where the violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE; or (3) caused a deprivation of educational benefits to the child. 20 U.S.C. § 1415(f)(3)(E)(ii); *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992) ("*Target Range*").

On appeal, T.S. argues the OAH Decision should be reversed on this issue because "the District did not timely conclude T.S.'s 2020–21 IEP that began on February 18, 2020, leaving T.S. without an IEP for the start of the 2020–21 year." (Opening Br. 5 (capitals omitted).) T.S. contends the District should have concluded his IEP team meeting prior to the beginning of the 2020–21 school year and that the failure to do so resulted in his unique needs going unaddressed. (*Id.* at 7.) He asserts that he is entitled to compensatory education. (*Id.* at 7–8; *see also* OAH Decision 4.)

The District argues "the ALJ properly held that [T.S.'s] Annual IEP was timely concluded." (Opp'n 13 (initial capitals omitted).) The District contends it completed T.S.'s IEP in a timely manner, the IEP process reasonably took an extended time because of the numerous IEEs to be reviewed and schedules to coordinate, and the delay in completing the IEP did not deny T.S. a FAPE but rather ensured parental participation in the IEP process. (*Id.* at 13–17; *see also* OAH Decision 4.)

The evidence supports the OAH Decision on this issue. ALJ Johnson did not err when she concluded that T.S. failed to meet his burden to prove that the District did not timely conclude the February 2020 IEP process, or that the delay in completing the IEP denied T.S. a FAPE. (*See* OAH Decision 7–8.)

First, the AR supports that the District held T.S.'s annual IEP meeting over five days, with each meeting lasting two hours before the team had to stop and reconvene at a later date. (AR 418 (S-25).) The IEP team held two meetings in February 2020, before COVID-19 was declared a global pandemic. (AR 317, 340, 391 (S-22, S-23, S-24)); *see CDC Museum COVID-19 Timeline*, https://www.cdc.gov/ museum/ timeline/ covid19.html (last visited December 9, 2022). A third meeting was scheduled for March 13, 2020, but it was cancelled because the interpreter for T.S.'s mother was sick. (AR 655 (D-36).) That meeting was ultimately held on May 20, 2020, after the District's spring break. (AR 392 (S-24); AR 560 (D-21).) The District was on summer break from June 11, 2020, through August 31, 2020, so the IEP team reconvened after school resumed in the fall, in October and November. (AR 560 (D-21); AR 562 (D-22); AR 418–24 (S-25); OAH Decision 6.)

Next, witness testimony supports that scheduling the IEP team meetings was difficult and the material to be covered extensive. (*See* OAH Decision 7.) Witnesses testified that scheduling and holding IEP team meetings with an interpreter, attorneys, and multiple independent evaluations to cover could reasonably require an extended duration. (*See* AR 838–39 (Tiffany Lockshaw Test.); AR 1341–42 (Helena Johnson Test.); AR 1642–43 (Eric Larson Test.).)

Also, the IEP meeting minutes reflect that T.S.'s parents and their attorney participated in each IEP meeting by asking questions, raising concerns, and requesting revisions to the goals, so the additional time ensured and encouraged parental participation in the IEP process. (AR 418–24 (S-25); *see* OAH Decision 7.) Further, during the months between March 2020 and September 2020 when the IEP team was developing T.S.'s annual IEP, the District continued implementing T.S.'s last agreed upon and consented to IEP, meaning he was not without an educational program in place at the start of the school year. (*See* AR 429–48 (S-28).) T.S. argues he is entitled to compensatory education services for educational benefits lost during the delay, but he does not identify any educational services or benefits he was denied as a result of the extended IEP process. (*See generally* Opening Br. 8.)

In sum, a preponderance of the evidence supports that the District did not fail to timely conclude the IEP process, particularly in light of the numerous evaluations to review, the number of schedules to coordinate, and the then-emerging global pandemic. Further, a preponderance of the evidence also supports that the extended conclusion of T.S.'s IEP did not impede his right to a FAPE, significantly impair his parents' opportunity to participate in the IEP process, or cause him a deprivation of educational benefits, and therefore the delay in concluding the IEP process did not deny T.S. a FAPE.

The burden to establish an IDEA violation is on the party seeking administrative review, *Schaffer*, 546 U.S. at 62, and likewise on the party appealing the administrative determination, *L.M.*, 556 F.3d at 910. T.S. does not carry his burden here, as he offers no evidence in the record to undermine the findings above. (*See generally* Opening Br. 5–8.)

Accordingly, the Court finds that a preponderance of the evidence supports that the District did not fail to timely conclude the IEP process, and T.S. fails to prove that any delay in completing the IEP denied him a FAPE. Accordingly, the Court **AFFIRMS** the OAH Decision on this issue.

### C. OT Assessment (OAH Issue Two)

ALJ Johnson articulated this issue as: "Did Long Beach fail to assess Student in the area of Occupational Therapy, including sensory integration, from September 2019 through September 2020, such that Student is entitled to an independent educational evaluation at public expense?" (OAH Decision 2.) She held that T.S. "failed to meet his burden proving [the District] had information warranting an assessment of any educationally related occupational therapy or sensory integration need, or that either Parents or a teacher requested an occupational therapy assessment." (*Id.* at 10.)

The IDEA requires a school district to assess a student in all areas related to a suspected disability. *See* 20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304(c)(4). Once a school district is on notice that a child has displayed symptoms of a disability, the district must assess the child to determine a child's educational needs. *See Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1118–20 (9th Cir. 2016). If a parent disagrees with a school assessment of their child, they have a right to obtain an IEE at public expense. *Id.* at 1111. When a parent disagrees with a school assessment and requests an IEE, the school district must either "file or fund," that is, file a due process complaint to establish the propriety of its assessment or fund the requested IEE. *Baquerizo v. Garden Grove Unified Sch. Dist.*, 826 F.3d 1179, 1185 (9th Cir. 2016).

Failure to conduct a timely or appropriate assessment is a procedural violation, *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031–33 (9th Cir. 2006), which may amount to the denial of a FAPE if it "result[s] in the loss of educational opportunity, or seriously infringe[s] the parents' opportunity to participate in the IEP formulation process, or . . . cause[s] a deprivation of educational benefits," *J.G. v. Baldwin Park Unified Sch. Dist.*, 78 F. Supp. 3d 1268, 1284 (C.D. Cal. 2015) (quoting *Amanda J.*, 267 F.3d at 892).

On appeal, T.S. argues the OAH Decision should be reversed on this issue because, "despite knowledge by the District that the parents wanted an independent

educational evaluation in occupational therapy and sensory integration, [the] District failed to assess in that area." (Opening Br. 8 (capitals omitted).) T.S. argues that the District was aware his parents had sensory processing and OT concerns based on a 2018 outside assessment. (*Id.* at 9 (citing AR 459).) He asserts that he presented the 2018 assessment to the District, and his independent psychoeducational evaluator referenced it in her 2019 IEE report, but the IEP team did not review the 2018 assessment at an IEP team meeting and the District never assessed T.S. in the area of OT. (*Id.* (citing AR 286).) T.S. also contends that the 2019 settlement agreement "indicated the parents' agreement to an evaluation" in OT, giving the District "clear and written notice" of the "parents['] desire for such an evaluation." (*Id.* at 10.)

The District contends "the ALJ properly understood what constitutes knowledge of a suspected disability and properly held that the District was neither required to conduct an OT assessment nor fund an IEE." (Opp'n 17 (initial capitals omitted).) The District argues T.S. did not exhibit OT or sensory integration needs, no witnesses testified that they had concerns regarding such needs, and the District had no reason to suspect T.S. required assessment in those areas. (*Id.* at 18.) The District also asserts that it offered an OT IEE in the 2019 settlement agreement only as a compromise, and that it never agreed that OT/sensory integration was an area of suspected disability. (*Id.* at 17.)

The evidence supports the OAH Decision on this issue. ALJ Johnson did not err in holding that T.S. "did not raise [OT] or sensory integration as an area of need during the relevant time period outside of the mediation and settlement agreement context," and that T.S. is therefore "not entitled to an [OT] or sensory integration [IEE] at public expense." (OAH Decision 10.)

T.S.'s arguments on appeal fail. First, the 2018 private OT assessment was neither school-based nor an IEE, meaning it was not education-based and therefore not directly relevant to T.S.'s ability to access his education. (*See* AR 459–61 (S-32).) Although T.S. contends that he provided a copy of that private assessment to the

1  District, he points to no evidence that either he or his parents ever asked the District
2  for an OT or sensory integration assessment or raised related concerns, other than in
3  the mediation and settlement agreement context.  (*See* Opening Br. 8–13; *see also*
4  OAH Decision 9.)  He argues that Dr. Johnson, his independent psychoeducational
5  evaluator, referenced the 2018 private OT assessment in her 2019 IEE report.
6  (Opening Br. 9 (citing AR 286 (S-21)).)  However, the page T.S. cites merely lists the
7  records that Dr. Johnson reviewed in preparing her report.  (AR 286 (S-21).)  And, as
8  the District noted at oral argument, despite recommending other assessments, Dr.
9  Johnson did not identify OT or sensory integration as an area of need for further
10 evaluation.  (*See* AR 315 (S-21).)

11       Further, the District presents evidence that the OT IEE was offered in the
12 2019 settlement negotiations purely as a compromise.  (Opp'n 17 (citing AR 471–74
13 (D-2)).)  The settlement agreement does not suggest the District ever suspected or
14 agreed that OT was an area of suspected disability.  (*See* AR 471–72 (D-2).)
15 Nevertheless, T.S. argues that, because his parents suspected OT was an area of
16 disability and requested an OT assessment during those negotiations, the District was
17 then "on notice" and obligated to assess OT.  But T.S. points to nothing in the record
18 that suggests his parents raised the concerns with the District outside the mediation
19 context, or that the District observed T.S. exhibit OT or sensory integration issues.
20 The IEP notes do not reflect that T.S.'s parents ever raised OT-related concerns at IEP
21 team meetings.

22       The law does not require a school district to assess an area based only on a
23 parent's desire for an assessment.  Rather, the law requires a school district to assess
24 in all areas of *suspected disability*, once the school district is on notice that a child has
25 *displayed symptoms* of that disability which affect educational access.  *See*
26 *Timothy O.*, 822 F.3d at 1118–20; *Park*, 464 F.3d at 1032; 20 U.S.C. § 1414(b)(3)(B).
27 In this case, T.S. failed to prove at hearing or on appeal that the District was on notice
28 that T.S. displayed symptoms relating to OT or sensory integration concerns.  At best,

1  T.S. established that the District knew, via the 2019 mediation and settlement
2  agreement, that T.S.'s parents desired an OT assessment. This desire, alone, does not
3  trigger an obligation to assess.

4  Finally, to the extent T.S. argues that the District was required to fund an OT
5  IEE pursuant to its "file or fund" obligations, *see Baquerizo*, 826 F.3d at 1185, the
6  District had not assessed T.S. in the area of OT and therefore there was no
7  education-based school assessment with which parents could have disagreed. Thus,
8  the obligation to file or fund was not triggered. *See* 34 C.F.R. § 300.502(b)(1).

9  The Court finds that a preponderance of evidence supports the ALJ's
10 conclusion that the District was neither required to conduct an OT assessment nor
11 fund an OT IEE. Accordingly, the Court **AFFIRMS** the OAH Decision on this issue.

12 **D.     Ikeda Recommendations (OAH Issue Five)**

13 ALJ Johnson articulated this issue as: "Did Long Beach deny Student a FAPE
14 from February 2020 through September 2020, by failing to provide Student with the
15 vision therapy services recommended by Dr. Ikeda?" (OAH Decision 3.) She held
16 that "Dr. Ikeda did not specifically recommend vision therapy," and that T.S. "failed
17 to prove he required vision therapy to access his education." (*Id.* at 17–18.)

18 When a parent obtains an IEE and gives it to the school district, the school
19 district must consider the IEE in any decision made with respect to the provision of a
20 FAPE to the child, so long as the evaluation meets specified criteria. 34 C.F.R.
21 § 300.502(c); Cal. Educ. Code § 56329(b)–(c).

22 On appeal, T.S. argues the OAH Decision should be reversed on this issue
23 because "the evidence at hearing established that further assessment was to be
24 conducted by Dr. Ikeda." (Opening Br. 13 (capitals omitted).) T.S. argues Dr. Ikeda
25 recommended an additional vision therapy assessment to determine the amount of
26 vision therapy T.S. required. (*Id.* at 16.)

27 The District contends, "the ALJ properly held that Vision Therapy was not
28 recommended and [the] District was not required to take further steps." (Opp'n 22

(initial capitals omitted).) The District argues that Dr. Ikeda did not recommend vision therapy and T.S. failed to prove he did or that T.S. required vision therapy. (*Id.* at 22–23.)

The evidence supports the OAH Decision on this issue. ALJ Johnson did not err in finding that Dr. Ikeda did not recommend vision therapy and correctly concluded that the District did not deny T.S. a FAPE by not providing him with vision therapy or further vision therapy assessment.

As part of the 2019 settlement agreement, the District agreed to fund a vision therapy assessment by Dr. Ikeda. (AR 472(f) (D-2).) At the February 18, 2020 IEP team meeting, Dr. Ikeda presented his vision therapy assessment report telephonically. (AR 515 (D-11); AR 418 (S-25).) The IEP team meeting notes reflect that Dr. Ikeda did not recommend vision therapy at that time and instead recommended T.S. try "focus support glasses" first:

> The assessor suggest[s] focus support glasses, with a follow up to determine his progress with the glasses. Mr. Schneider asked if vision therapy was recommended. The assessor stated that it would be recommended with further testing on the need for the length and duration. Next steps: the family will schedule another appointment in order to determine services needed and further recommendations.

(AR 515 (D-11).)

Additionally, the vision assessment IEE report confirms what the IEP notes indicate, that Dr. Ikeda did not specifically recommend vision therapy. (AR 490–95 (D-5).) Rather, he recommended special focus glasses for T.S. to try, with a follow up later to determine *whether* further assessment and vision services were needed:

> 1. recc prescribing accommodative support glasses for classroom (begins process to address visual processing deficits)  2. return for follow up to check visual status; review findings and recommendations following completion[.]

(AR 495 (D-5).)

14

As required by the IDEA, the IEP team appropriately considered Dr. Ikeda's IEE report at the February 18, 2020 IEP team meeting. (AR 515 (D-11)); 34 C.F.R. § 300.502(c). Further, the District does not dispute that Dr. Ikeda recommended vision support glasses and a subsequent follow up appointment. (*See* AR 515 (D-11).) However, T.S. points to nothing in the AR to suggest that he ever obtained or tried the recommended special focus glasses, a necessary step before a follow up appointment could be scheduled. Regardless, the evidence demonstrates that Dr. Ikeda did not specifically recommended vision therapy, so the District did not deny T.S. a FAPE "by failing to provide [him] with the vision therapy services recommend[ed] by Dr. Ikeda." (OAH Decision 17.)

Finally, even if Dr. Ikeda had recommended vision therapy services, the law does not require a school district to implement an IEE assessor's recommendations unless the student needs the recommended accommodation to *access his education*. *See Park*, 464 F.3d at 1032 (finding no procedural violation based on vision assessment where vision was not hindering student's education). T.S. fails to establish, or even suggest, that he requires vision therapy to access his education.

The Court finds that a preponderance of the evidence supports that Dr. Ikeda did not recommend vision therapy services, and even if he had, the District did not deny T.S. a FAPE by failing to provide them. Accordingly, the Court **AFFIRMS** the OAH Decision on this issue.

## V. CONCLUSION

For the reasons discussed above, the Court **AFFIRMS** the OAH Decision on all issues raised and finds the District is the prevailing party.

**IT IS SO ORDERED.**

December 13, 2022

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**